# Bank of Pennsylvania *against* Wise.

A purchaser at a sheriff's sale of a lessor's title to real estate in the possession of a tenant, is entitled to the rent which becomes payable after the execution and acknowledgement of the deed.

WRIT of error to the common pleas of *Dauphin* county.

This was action of replevin by the Bank of Pennsylvania against John Wise, Thomas Elder and Jacob M. Haldeman, in which the jury found the following special verdict.

That George Fisher being seised in fee of, in and to the house and lot of ground in the plaintiff's declaration mentioned, did, on the 28th day of July 1828, lease the same to the President, Directors and Company of the Bank of Pennsylvania for the term of five years from

and after the 1st day of August 1828, for and upon the yearly rent of 425 dollars, payable in equal half yearly payments.

They further find, that the President, Directors and Company of the Bank of Pennsylvania, on the day and year last aforesaid, in pursuance of said lease, went into possession of the aforesaid premises, and continued in possession thereof until the 6th day of March 1831.

They further find, that on the 1st day of January 1831, Jacob Seiler, Esq., as high sheriff of Dauphin county, sold at public sale, in due form of law, the aforesaid premises to the said Thomas Elder and Jacob M. Haldeman for the sum of 9750 dollars, in virtue of a certain writ of *venditioni exponas* issued out of the court of common pleas of the county of Dauphin, returnable to the term of January 1831, No. 7, wherein Jane Kean, administratrix with the will annexed of John Kean deceased, for the use of Samuel Reynolds, Thomas G. Laufer and George Kimmel, assignees of John Kean, were plaintiffs, and George Fisher, Esq., defendant.

They further find, that on the 18th day of January 1831, Jacob Seiler, Esq., as high sheriff as above stated, made, executed, acknowledged and delivered a deed, in-due form of law, for the said premises so sold as aforesaid to the said Thomas Elder and Jacob M. Haldeman in open court, to wit, in the court of common pleas of Dauphin county.

They further find, that the President, Directors and Company of the Bank of Pennsylvania had full notice of the aforesaid sale of the said premises to the said Thomas Elder and Jacob M. Haldeman by the said sheriff.

They further find, that on the 1st day of February 1831, a half year's rent, to wit 212 dollars 50 cents, fell due to said premises, and was in arrear and unpaid by the President, Directors and Company of the Bank of Pennsylvania, on the said lease, and which was then demanded by the said Thomas Elder and Jacob M. Haldeman of the President, Directors and Company of the Bank of Pennsylvania, on the aforesaid premises, who then and there refused to pay the same.

They further find, that the said Thomas Elder and Jacob M. Haldeman issued and executed a landlord's warrant, bearing date the 3d day of March 1831, and directed the same to the within mentioned John Wise as constable of the borough of Harrisburg, in the county of Dauphin.

They further find, that on the 4th day of March 1831, the aforesaid Thomas Elder and Jacob M. Haldeman delivered the said landlord's warrant to the said John Wise, constable as aforesaid to be executed; who, on the same day and year last aforesaid, in pursuance of the said landlord's warrant, and in virtue thereof, in due form of law distrained the goods and chattels in the plaintiff's declaration mentioned, in and upon the aforesaid premises, for the rent in arrear within before stated. But whether, &c.

But if the defendants are entitled to recover in the aforesaid pre-

mises, then the jury find for the defendants 212 dollars 50 cents, with interest from the 1st day of February 1831, damages, with six cents costs.

But if the defendants are not entitled to recover the aforesaid sum for the rent in arrear, but are entitled to recover in the premises rent from the 18th day of January 1831 to the 1st day of February 1831, then they, the jury, further find for the defendants the sum of 15 dollars 25 cents damages, with interest from the 1st day of February 1831, and six cents costs.

But if the defendants are not entitled to recover, then the jury find for the plaintiffs, with six cents damages and six cents costs.

Upon this finding, the court below (Blythe, president) rendered a judgment for the defendants for 212 dollars 50 cents, the rent which fell due after the acknowledgement of the sheriff's deed.

*M'Cormick*, for plaintiff in error, cited, Shearer *v.* Stanly, 2 *Rawle* 276 ; Hawk *v.* Stouch, 5 *Serg. & Rawle* 161 ; 3 *Cruise* 324; *Cro. Eliz.* 742 ; Hall *v.* Benner, 1 *Penns. Rep.* 402.

*Elder*, for defendant in error, cited, Hart *v.* Israel, 2 *Brown's Rep.* 22; 5 *Binn.* 526.

The opinion of the Court was delivered by

KENNEDY, J.—The only question to be decided in this case is, whether the purchaser at sheriff's sale of the lessor's title and interest to and in a house and lot of ground, which had been regularly taken in execution, condemned and sold by the sheriff, be entitled to demand and receive from the lessee, the tenant in possession, the whole of 212 dollars 50 cents, being a half year's rent which became payable fourteen days after the purchasers had paid the purchase money to the sheriff and received from him his deed, duly executed and acknowledged, consummating the sale.

In this case the sheriff, on the 1st day of January 1831, sold the house and lot to Thomas Elder and Jacob M. Haldeman, two of the defendants, for 9750 dollars; and after having received from them the purchase money on the 18th day of the same month, executed and delivered to them, in due form, a deed of conveyance for the same; of which immediate notice was given by the purchasers to the President, Directors and Company of the Bank of Pennsylvania, who were in possession of the house and lot under a lease from George Fisher, the defendant in the judgment and execution under which the sale had been made. The lease was for a term of five years, commencing with the 1st day of August 1828, at a rent of 425 dollars per annum, payable half yearly. On the 1st of February following the delivery of the deed by the sheriff to the purchasers, 212 dollars 50 cents, a half year's rent, fell due; and on the 4th of March ensuing, they, by their bailiff John Wise, the other defendant, distrained for it; upon which the writ of replevin commencing this action was sued out by the plaintiffs, and the property distrained on was replevied.

For the fourteen days, that is, the time which elapsed from the delivery of the sheriff's deed to the purchasers, until the 1st day of February 1831, when the first half year's rent became payable after the sale, the plaintiffs were willing to pay the purchasers such proportion of the rent as that time bore to one hundred and eighty-four days, which is the whole number of days in the half year, but for the residue they say that they are bound to account to the defendant in the execution, as he continued to be their landlord and the owner of the reversion to the 18th of January 1831.

The idea of apportioning the rent that becomes payable after the purchaser of a reversionary interest in fee at a sheriff's sale, has paid the purchase money and received his deed of conveyance for it, between him and the defendant in the execution as whose estate it was sold, is unknown to the law, and cannot be reconciled with any of its analogous and fixed principles.

It is said our act of assembly of the 6th of April 1802, entitled "an act to enable purchasers at sheriff's and coroner's sales to obtain possession," has a direct and important bearing upon this question, and it may be, therefore, well enough to examine and see what the law was, in regard to it, before the passage of that act.

We will suppose that the owner in fee of a house and lot of ground had leased it for a term of twenty years, at a rent of 200 dollars per annum, payable half yearly, under which the lessee took possession, and shortly afterwards a creditor of the lessor obtained a judgment against him, upon which he proceeded by execution and sold all the right, interest and estate of the lessor in the house and lot. Three months before the day at which a half year's rent became payable, according to the terms of the lease, the sheriff executed and delivered a deed to the purchaser, who thereupon gave notice immediately to the lessee of his having become the purchaser of the leased premises, and of his having received from the sheriff a deed of conveyance duly executed and acknowledged. At the time of the sale and delivery of the deed by the sheriff, no rent was due and payable agreeably to the terms of the lease, and I therefore presume that it will be admitted that the lessee could not have been called on at that time by the defendant in the execution, nor yet by any body else, to pay a rent of three months, part of the half year which had elapsed, because such a demand would be contrary to his agreement, which was, to pay the rent half yearly, and not quarterly. So, after the half year has run, I presume that it will be admitted that the defendant in the execution can have no colour of claim to the rent for the last three months of it. To this part of the half year's rent it is given up by all that the purchaser at the sheriff's sale has an indisputable claim. But then to say that the lessee, even at the expiration of the half year, shall be bound to pay the rent for the last three months thereof to the purchaser, and for the first three to the defendant in the execution, would be to split up a demand into two, which by the terms of the contract giving rise to it, was one and entire, and would

subject the lessee to two actions instead one, contrary to his agreement, and contrary to a well known rule of the common law.   As the lessee, however, has had the full enjoyment of the leased premises, there can be no good reason for his not paying the whole of the half year's rent as soon as it shall become payable by his lease to the party entitled to receive it.   Then seeing the purchaser has succeeded to the rights of the landlord, why shall he not receive the whole rent?   The only reason, of the least plausibility, that can be alleged for apportioning the rent according to time between the defendant in the execution and the purchaser at sheriff's sale, by giving one half of it, on account of the first three months of the half year, to the defendant in the execution, and the other half, for the last three months, to the purchaser at sheriff's sale, would be to say that it did not properly and truly form any part of the subject matter or estate sold by the sheriff; that the defendant in the execution had received no consideration, and the purchaser had paid none for it. But by inquiring into, and ascertaining what was really sold and bought at the sheriff's sale, it will be seen that there is no ground whatever for such a suggestion, and that it is a great misapprehension of the matter to suppose it ; for we shall find that the purchaser at sheriff's sale not only purchased, but must be considered as having paid for, and as being invested with, a right to demand and receive all the rents which shall become payable, according to the terms of the lease, after the time that his title to his purchase became perfect, by his payment of the purchase money, and receipt of the sheriff's deed.   A right to demand and receive all such rents formed the very heart and essence of his purchase, seeing it was merely a reversionary interest.

It will appear that there is no proposition better established in the law, than, that without an express reservation, an assignment or transfer of the reversion, where rent is becoming payable at certain periods to the reversioner, carries with it the right to demand and receive the rent which shall become payable afterwards.

Littleton, in section two hundred and twenty-eight, says, that by a grant of the reversion the rent passeth : and my Lord Coke, in his commentary upon it, tells us, that " the reason thereof is because the rent is *incident* to the reversion, and passeth away by the grant of the reversion, as with the superior, without saying *cum pertinentiis*."   1 *Inst.* 151 *b*; *Shep. Touch.* 89.   And in *Co. Litt.* 215 *b*, it is laid down that " both assignees in deed, and assignees *in law*, shall have the *rent*, because the rent, being reserved of the inheritance to him and his heirs, is *incident* to the reversion and *goeth with the same.*"   Indeed Noy lays it down as a maxim, that by a grant of the reversion the rents pass.   *Noy's Maxims*, ch. 21, *Rents, p.* 41.   So wherever the covenant runs with the estate, and it is passed with or *without deed*, the assignee, either *in law* or by act of the party, shall have the benefit of the covenant.   Noke *v.* Acoder, *Cro. Eliz.* 373, 436.   Now a purchaser at sheriff's sale is considered an assignee in

law, and expressly recognized as such in Spencer's case, 5 *Co.* 17 ; and it is there laid down that the purchaser of a term for years of a house and lot of ground which had been taken in execution and sold by the sheriff, was entitled to the benefit of a covenant contained in the lease on the part of the lessor to repair the houses.　The words of the resolution are, "and he to whom a lease for years is sold by force of any execution, shall have an action of covenant in such case as a thing annexed to the land, although they come to the term *by act in law.*"　The same law, as it is there further resolved, is of a tenant by statute merchant, or statute staple, or *elegit*, of a term. The maxim of law is, *cuicunque aliquid conceditur, conceditur etiam et id sine quo res non esse potuit.*

In England a reversion in fee, to which a rent is incident, cannot be taken in execution and sold as it may in this state under our acts of assembly passed in 1700 and 1705; but then it may, under the statute of *West.* 2, *cap.* 18, 13 ed. 1, be taken and extended upon a writ of *elegit*, and after the execution of the writ of *liberare*, the creditor is entitled to receive a moiety of all the rents which shall become payable afterwards, until he shall have his judgment fully satisfied out of the same, and the lessee will be compelled to pay it to him.　See Sir Thomas Campbell's case, 1 *Roll. Ab.* 894, *l.* 12 ; 3 *Leo.* 113 ; *Moore's Rep.* 36 ; 4 *Com. Dig. tit. Execution* (c. 14) *by elegit, p.* 131.

In some instances the assignee, by operation of law, is placed in a more favourable situation than an assignee by act of the party was at common law, as the creditor who has taken in execution a rent charge, and extended it upon a writ of *elegit*, is entitled to demand and receive the rent afterwards as it becomes payable, *without attornment* of the tenant ; because the law having transferred by its operation the estate to him, it will give the *means* of enjoying it.　2 *Bac. Ab.* 712, 713, *tit. Execution* ; *Moore* 32, *pl.* 104.

So the lord, by escheat, who by operation of law comes into the place of the lessor in fee dying without heirs, may distrain for rent which becomes payable after the death of the lessor, because it is *incident to the reversion.* 3 *Cruise's Dig.* 462, *tit.* 30, *Escheat, sec.* 35, *New York ed. of* 1827 ; 1 *Inst.* 215 b.

The rent is so closely, so inseparably I may say, connected with the reversion, that, without some positive act of the lessor, it is ever considered as following the reversion and belonging to it until it has become actually and completely payable.　Hence, if the person entitled to receive the rent outlives the day on which it becomes due, and then dies, it will go to his executor or administrator as a part of his *personal estate;* but if he die on the day *preceding* the day of *payment*, the rent will go to the heir as incident to the reversion, and as part of the real estate.　3 *Cruise's Dig. tit.* 28, *Rents, ch.* 1, *sec.* 59, *New York ed. of* 1827.

· But it is said, let the right of the purchaser at sheriff's sale of the reversion to receive the rent that shall become payable after his title

under the sale has been perfected, be as it may by an application of the principles of the common law: yet, that, by the third section of the act of our legislature passed the 6th of April 1802, the rent must be apportioned, where the purchaser receives his deed from the sheriff at any intermediate period between the days appointed in the lease for the payment of it; that the defendant in the execution is entitled to receive the rent up to the day on which the purchaser shall receive his deed, and that the purchaser shall only receive rent from that time.     This section is in the following words: "Where any lands or tenements shall hereafter be sold by any sheriff or coroner as aforesaid, which shall be at the time of such sale, or at any time afterwards, held or possessed by any tenant or lessee, or person holding or claiming to hold the same under the defendant or defendants named in the execution, by virtue whereof the same lands or tenements shall be sold by such sheriff or coroner, the purchaser or purchasers of the same lands or tenements shall (after receiving the sheriff or coroner's deed for the same) be considered as the *landlord* or *landlords* to such tenant or lessee or person claiming to hold the same under the aforesaid defendant or defendants, and shall have the *like remedies* by distress or otherwise, to recover any rents *due subsequent to such sale,* as *the same defendant or defendants,* as whose property the same lands or tenements shall be sold, *might or could have if no such sale should take place;* and if, *after notice* of such sale, the said tenant or lessee or other person occupying the premises aforesaid shall pay *any rent* to the said *defendant* or *defendants,* as whose property the said premises may have been or shall be sold as aforesaid, the said tenant or lessee or other occupier as aforesaid shall be *liable to repay* the same to the purchaser or purchasers aforesaid."

Now with respect to those who purchase lands at sheriff's or coroner's sales, which are held and occupied by tenants under leases given by the defendants named in the executions before the date of the liens of the debts or claims to satisfy which the sales are made, this section is, to me, plainly declarative of what the law was before the passage of the act.     But if it was intended, as has been said, to embrace the case of a sale of land made by a sheriff or coroner, which is occupied by a lessee or tenant holding the same under a lease made subsequent to the date of the lien of the judgment under which the sale is made: then, it, in language as forcible and as perspicuous as it was possible to use, makes the purchaser at the sheriff's or coroner's sale the landlord, and the occupant of the land his lessee or tenant; giving the purchaser an express right and authority to demand and receive *any rents due subsequent* to such sale, and forbidding the tenant of the land after notice of the sale to pay any rent so becoming due to the defendant in the execution under the penalty of having to pay it again to the purchaser; thus securing to the purchaser at sheriff's or coroner's sale, in such case, a right merely to the *reversion,* which, without more, would entitle him to all the rent becoming *due* or *payable* after the date of his purchase, as an *incident* to

[Bank of Pennsylvania v. Wise.]

the estate purchased, the same as in the first case, where the tenant of the land holds under a lease made anterior to the date of the lien of the judgment or claim under which the sale was made. His remedies by distress or otherwise for the recovery of the rent that shall become *due subsequent* to the sale, shall be the same as that of the defendant named in the execution would have been provided the sale had never taken place. To rent which became *due* or *payable* before the sale, it is clear that the purchaser can make no claim; but to the rent which shall become *due* or *payable* after that, nothing can be made more clear than his right to it by the terms of this act, which are so perfectly free from all ambiguity, that I cannot see how even scepticism itself can raise a doubt about it.

But it has been contended that the term "due," as used in this section of the act, in connexion with the other words in the clause, "any rents *due* subsequent to such sale," in order to designate what rent the purchaser shall be entitled to receive, is not to be understood as embracing all the rent that shall become *payable* after the sale. That rent in its nature is a demand that may be *debitum in presenti,* though *solvendum in futuro,* and must be so considered here. West *v.* Sink, 2 *Yeates* 274, is relied on to support this proposition, and cited also to show that the same interpretation which is contended for by the counsel for the plaintiff in error, was given there to the word "due," as used in the act of the 21st of March 1722; which makes the goods of the tenant, when taken in execution upon the leased premises, liable, first, to the payment "of all such sum or sums of money as are or shall be *due* for rent at the time of taking such goods by virtue of such execution," &c. In this case the rent was not payable at the time of taking the goods in execution, but some part of the year had run; and the court held, that the landlord was entitled to receive his rent up to the time of the levy, although no rent was then payable. And the court there do say, "it was *debitum in presenti,* though *solvendum in futuro;*" but then they also add, "such had been the *uniform construction* of that law." I have great respect for the intelligence and law learning of the judges who composed this court at the time that decision was given by it; but I think it pretty obvious that it proceeded altogether from a conviction resting upon the minds of the court at the time, that it had been the *universal practice* to apportion the rent under this act of 1722, and to allow the landlord to receive out of the money arising from the sale of the tenant's goods taken in execution, a due proportion of the rent, according to the time that had elapsed since the last payment, or commencement of the lease, not exceeding one year in the whole, whether the rent had become payable or not, without much regard to the phraseology of the act itself. The court at the same time seem to have been aware that their decision might not be considered as comporting with the common and ordinary meaning of the words employed in the act, and therefore, probably without examination, endeavoured to show that in the *legal* acceptation of them, it might

III.—3 A

be sustained by imagining the rent to be *debitum in presenti*, though *solvendum in futuro*. But surely it was a great mistake in the court to say, that rent which had not become payable was *a present debt to be paid in future;* which means a debt that the party is *positively* and *absolutely* bound to pay, arising upon a consideration which is passed; as in the case of an obligation or a bond given for the payment of a certain sum of money at a future day; or a promise made to pay a certain sum of money at a subsequent day, as the price agreed to be given for goods bought and received by the promissor of the promissee: but if it be a promise or covenant to pay a certain sum of money to another at a future day, as a compensation for his building in the mean time a house of certain dimensions for the party promising or covenanting to pay, it cannot be called *debitum in presenti quamvis sit solvendum in futuro;* because it is manifest, from the very nature of this last engagement, that no duty or obligation whatever can exist or arise to pay the money unless the house shall be built, which may or may not be done. See *Co. Litt.* 292 *b.* So the consideration for the payment of rent is the *enjoyment of the thing demised,* which is executory, and therefore uncertain, but must first be complete before any obligation or duty to pay the rent can arise. Lord Chief Baron Gilbert says, "rent service is something given by way of *retribution* to the lessor for the land demised by him to the tenant, and consequently, the lessor's *title to the rent* is founded upon this, that the land demised is *enjoyed* by the tenant *during the term* included in the contract, for the tenant can make *no return* for a thing *he has not;* if therefore the tenant be *deprived* of the thing *letten,* the obligation to pay the rent *ceases,* because such obligation had its *force* only from the consideration, which was the *enjoyment of the thing demised.*" *Gilb. on Rents* 145; Vaughan v. Blanchard, 4 *Dall.* 124; 2 *Roll. Ab. tit. Rent, O*; 8 *Cowen* 727. Hence if the tenant or lessee shall be evicted from the land demised, by the lessor, or by a third person, under a title paramount to that of the lessor, at any time before the rent shall have become actually payable, he will thereby be discharged from the payment of it entirely, and there shall be no apportionment of it. In Clun's case, 10 *Co.* 128, it is laid down, that "the rent reserved is to be paid out of the *profits* of the land, and is not *due* until the profits are taken by the lessee;" and for this reason it was there held, "that if the land is evicted, or if the lease determines before the *legal time of payment,* no rent shall be *paid;* for there shall *never* be an *apportionment* in respect of *part of the time,* as there shall be upon an eviction of part of the land." So little of the character of a present debt or *duty* has rent which has not become payable, that a release of all *demands* (which is perhaps the most comprehensive term that could be used to embrace any thing of the kind, *Co. Litt.* 291 *b.*) given by the lessor to the tenant does not discharge it. Collings v. Harding, *Cro. Eliz.* 606; Trevil v. Ingram, 2 *Mod.* 282; Henri v. Hanson, 1 *Leo.* 99; Ingram v. Bray, 2 *Leo.* 210; Stevens v. Snowe, 2 *Salk.* 578. And Littleton, in section five hun-

dred and thirteen, says, that a release of all actions by the lessor to the lessee will be no bar to an action of debt brought afterwards for rent which became payable subsequently; and the reason assigned therefor by Lord Coke is, " because it was neither *debitum non solvendum* at the time of the release made, for it is to be paid out *of the profits of the land*, and if the land be evicted from the lessee before the rent became *due* the rent is avoided." *Co. Litt.* 292 *b.*

Rent cannot be likened to interest, which is said to be due *de die in diem*, because that is allowed for the delay of payment of the principal that is *already due*.  Hay *v.* Palmer, 2 *P. Wms* 502; Banner *v.* Lowe, 13 *Ves.* 135.  Under this view of the nature of rent, that by the terms of the lease has not become payable, it is evident that the court in West *v.* Sink mistook the meaning and import of the term " due" when applied to it, because from the foregoing authorities it appears that rent in *legal parlance* is never considered to be *due* until it has become *actually payable*.  In fine, that the words " due" and " payable," when applied to rent, are convertible terms; and that they are so in common acceptation, and in the general understanding of mankind, will not be, as I think it never has been, denied. The late Chief Justice Tilghman was no doubt of opinion that the construction put upon the act of 1722 by the court in West *v.* Sink, was not warranted by the terms of the act, however far it might have been so by the practice which had obtained under it; but he seems to have acquiesced in it only because he was unwilling to disturb a long settled construction.  See Binns *v.* Hudson, 5 *Binn.* 506. The cases of Hawk *v.* Stough, 5 *Serg. & Rawle* 157; Scheener *v.* Stanley, 2 *Rawle* 276, and Hall *v.* Benner, 1 *Penns. Rep.* 402, which have also been cited and relied on by the counsel for the plaintiff in error, have not the slightest bearing upon the question presented by the case now before us.  They only go to show that the sale of the sheriff is not considered as closed, and the purchaser fully invested with the title to the property sold, until he has paid the purchase money and received from the sheriff a deed duly executed; and that before this is done he has no right to claim either the possession of the land, nor yet any rent that shall have become due or payable previously.

In England, under the statute of 8 *Anne, ch.* 14, *sec.*1, goods taken in execution upon any demised premises, cannot be removed till the landlord has been paid his whole rent, if not more than a year be due.  But then the rent must be *due*, that is *payable*, at the time of the execution, otherwise no rent can be claimed.  Gwilliam *v.* Baker, 1 *Price* 274; *Chambers's Landlord and Tenant* 616, 617.  In New Jersey, where they have a statute of similar import with ours, it was decided in Schenck *v.* Vannest, 1 *South.* 323, that the sheriff was not bound to pay rent to the landlord out of the proceeds of the execution, upon a lease where the rent was payable quarterly, unless the quarter had actually expired.  And to the same effect is the decision of the supreme court of New York in Hazard *v.* Raymond,

2 *Johns. Rep.* 478, upon a like statute of that state. So that it would seem that the interpretation which has been given to our statute of 1722 is an anomaly, and contrary to all judicial construction and legal understanding of the same matter and phraseology elsewhere, and therefore ought not to be adopted as a rule for giving a meaning to nearly the same language, used in another statute for a different purpose. But even admitting that the clause, "any rent due subsequent to such sale," is so ambiguous as to be susceptible of either construction contended for by the respective parties in this case, still I think there are some powerful reasons why it should not receive that claimed by the plaintiffs in error.

First, it may be observed that unless the great object which the legislature had in view in passing the act of the 6th of April 1802 would seem to require it, a settled principle of the common law, which has incorporated itself with the rules of property, ought not to be set aside by the mere construction of a clause of doubtful import. Now it is a well established principle of the common law, that an entire contract, claim, demand or interest, cannot be apportioned and divided, so as to create, and subject a party against his consent to, several suits and causes of action : although the exigences and interests of society have broken in upon this rule and caused it to yield to the accommodation of mankind in apportioning rent, wherever there has been, either by act of law or by act of the party, a division made of the land out of which the rent issues, or of the reversion to which it is incident ; because without this privilege a man who can only dispose of his real estate to advantage by dividing it, might be forced to make a sacrifice of it ; and it is also obvious that the numerous members of the same family, in many instances, could not be accommodated, or their interests at all promoted without it. Hence a reversioner may sell and dispose of his estate, in different parts, to as many different persons, and the lessee or tenant will be bound to pay to each his due proportion of the rent. Or if he should die, leaving a number of children, his estate will descend and pass by operation of law to them to be held, in this state, as tenants in common, and each may claim, and the tenant will be bound to pay to him his proper proportion of the rent. See Wotton *v.* Shirt, *Cro. Eliz.* 742 ; *Litt. sec.* 224 ; 1 *Roll. Abr. tit. Apportionment, D. pl.* 3, 4, 5. Yet in no case whatever has rent ever been permitted by the common law to be apportioned in respect to *time ;* see Clun's case already referred to, 10 *Co.* 127 ; no, not even in equity. Jenner *v.* Morgan, 1 *P. Wms* 392 ; Hay *v.* Palmer, 2 *Ibid.* 502. And, therefore, if the tenant for life gave a lease for years, rendering a yearly rent, which was payable at the expiration of the year, and he died but a day before the year expired, the rent could not be apportioned, and the tenant was under no obligation to pay any part of it. See 3 *Kent's Com.* 376. This was the law in England until the passage of the statute of 11 *Geo.* 2, *c.* 19, which altered it merely as to leases made by tenants for life who should happen to die during

the term, by giving to their executors or administrators a right to recover from the under tenants a proportion of the rent, according to the time that had elapsed from the last day at which it was payable.

We have also seen, that where a lease is made by the tenant in fee, and the lessor die even as late as the day assigned for the payment of the rent at any time before midnight, the rent shall go *with the land* to the heir, and not to the executors or administrators, the reason of which is, because it is not considered any part of the personal estate ; for if it were, it would belong to the personal representatives and not to the heir, but being part of the real estate, it belongs to the heir. 3 *Cruise's Dig. tit.* 28, *Rents, ch.* 1, *sec.* 60, *New York ed.* 1827 ; 1 *Saund.* 287, *also note* 17. The rent then which has not yet become payable, being part of the real estate of the reversioner, if the reversion be taken in execution and sold for his debts, it would follow that no part of such rent can be reserved to him upon the sale being made by the sheriff, according to the decision of this court in the case of Reigle *v.* Seiger, 2 *Penns. Rep.* 340, where it was held that the sheriff was bound to sell the debtor's *whole interest* in the land, and that he could lawfully reserve nothing for him.

And indeed why should any thing be reserved to him of his real estate, when all is required for the payment of his debts ? Most certainly the law does not sanction any such right, but requires, and so does every principle of justice, that the debtor's estate shall be first appropriated to satisfy the claims of his creditors. It may be greatly for the benefit of the creditors of the owner of a reversion in real estate, that the rent which has not become payable shall be considered as part of, or at least incident to the reversion, and therefore pass to the purchaser at sheriff's sale ; because this being understood to be the law of the state, the greater the sum is, of rent, and the sooner it will be receivable by the purchaser after the sale, the higher of course will be the price that he will give for the property. So that in reality the purchaser gains nothing by it, nor does the owner of the estate lose any thing, for he either receives it in the surplus of the purchase money, after satisfying his debts, or if there should be no surplus, then he has the benefit of it in the payment of his debts. But if the debtor were permitted to demand and to receive of the tenant or lessee an apportionment of the rent, he still having creditors not paid, they might or might not get it, just as he pleased to give it to them. From these considerations, it appears to me that the construction of this act of 1802 which is contended for by the counsel of the plaintiff in error, would be calculated to defeat, in part at least, instead of to promote the design of the legislature. Their great design was, no doubt, to encourage agriculture, and to secure lessees or the tenants of lands in the enjoyment of them, according to the terms of their leases, without prejudicing creditors in the recovery of their just debts against the lessors or reversioners.

It has also been urged that rent comes in lieu of the emblements of the land, and that as it has been ruled by this court in the case of

Stambach, 2 *Rawle* 161, and recognized in Myers *v.* White, 1 *Rawle* 356, that the purchaser at sheriff's sale is not entitled to the emblements, he ought not, for the same reason, to have rent, or at least such rent as might by an apportionment be considered a proper equivalent for the enjoyment of the land up to the time of the sale. In answer to this, it may be sufficient to state, that the law makes a very different disposition of the corn or grain growing on the land at the death of the owner in fee, where it was sown by him, from what it does of the rent which has not become payable at the time of his death, for land of which he dies the lessor and owner in fee. In the first case, the grain growing upon the land is considered personal estate, and as such goes to the executors or administrators; but in the latter case, the rent is considered as appertaining to the real estate, as incident to the reversion in fee, and passes with it to the heirs. But even where the owner in fee, after having sown the land, and before severance of the crop, conveys or devises the land, the emblements, that is the corn growing on the land at the time of the conveyance or the death of the testator, will pass with the land to the grantee or devisee. In Grantham *v.* Hawley, *Hob.* 132, " it was agreed by the court that if A, seised of land, sow it with corn and then convey it away to B for life, remainder to C for life, and then B die before the corn is reaped ; now C shall have it, and not the executors of B, though his estate was uncertain." It was also adjudged in *Godbolt's Rep.* 159, " that if land, which is sowed, be leased to one for life, the remainder to another for life, and the tenant for life die before the severance of the corn, the remainder-man shall have it." Likewise if a man seised in fee sow copyhold lands and surrender them to the use of his wife, and die before the severance, it seems that the wife shall have the corn, and not the executor of the husband, for this is a *disposition of the corn*, it being *appurtenant to the land ;* and since the husband has disposed of it during his life, it cannot go to his executors. *Roll. Abr.* 727, *tit. Emblements, pl.* 18 ; *Gilb. Ev.* 214 [247].

And in Spencer's case, *Winch.* 51, it was held that the devisee was entitled to the corn growing on the land at the death of the testator, which had been sown by him. It is also there said to have been adjudged in Allen's case, that where a man devised land, which was sowed, for life, with remainder over in fee, and the devisor died and the devisee for life also died before the severance, he in remainder should have the corn, and not the executors of the tenant for life. And Winch, Justice, said, that it had been adjudged that if a man devise land and after sow it, and then die, the devisee shall have the corn, and not the executor of the devisor. See, also, *Cro. Eliz.* 61, 464.

It is said, the reason why corn shall pass to the donee as appertaining to the soil, and not to the heir, is, that every man's donation being taken most strongly against himself, shall not only pass the land itself, but the chattels that belong to it. *Gilb. Ev.* 214, margi-

[Bank of Pennsylvania v. Wise.]

*nal page* 247 ; 1 *Morgan, L. E.* 387, 388. And the devisee's right to the corn is said to be founded upon the presumed intention of the devisor in his favour. West *v.* Moore, 8 *East* 343. Mr Hargrave, however, thought it not easy to account for this distinction which is made between the heir and devisee. *Co. Litt.* 55 *b,* note 2.

Whether corn or grain sown by a defendant in the execution, and growing upon the land at the time it was sold, and the deed made and delivered by the sheriff to the purchaser, ought to be considered as *appurtenant to the land* and as passing with it to the purchaser, where such corn has not been *previously and separately disposed* of, is a question that does not necessarily arise in this case, and upon which I forbear to express an opinion. The same reason, however, which has been mentioned for its passing under the grant or devise of the land by the owner himself, it would seem, could not well exist where the land is transferred by operation of law.

The same question which is now presented in the case under our consideration, was adjudged in favour of the defendants in error by the district court of the city of Philadelphia in 1811, in the case of Hart *v.* Israel, 2 *P. A. Browne's Rep.* 22. Also in the same way by this court at Pittsburgh, in Campbell *v.* Endsly, which was never reported ; and again at Sunbury, in Johnson *v.* Smith, 3 *Penns. Rep.* 496, it was held that a sale of the reversion by the reversioner, carried with it the right to the vendee to receive the rent for the year which had nearly run at the time of the sale.

I therefore consider the judgment of the court below fully sustained by law, reason and authority.

Judgment affirmed.